UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ARTHUR GLICK TRUCK SALES, INC.,

                              Plaintiff,                    Case No. 11-CV-2824 (KMK)

          -v-                                               OPINION AND ORDER

STUPHEN EAST CORP. & TRAVELERS
CASUALTY AND SURETY COMPANY OF
AMERICA,
                              Defendant.

Appearances:

Gerald Orseck, Esq.
Orseck Law Offices
Liberty, New York
*Counsel for Plaintiff*

Gary D. Silver, Esq.
Stoloff & Silver, LLP
Monticello, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

          For those who find great joy in reading about the Uniform Commercial Code ("UCC"),

this case will make your day.  In late 2007 and early 2008, Wolverine Fire Apparatus Company

("Wolverine") entered into separate contracts with the Beaverkill Valley Fire District

("Beaverkill") and the Forest Waverly Fire Department ("Waverly") (collectively, "the Fire

Districts")—each contract for the sale of a completed fire truck.  Defendant Travelers Casualty

and Surety Company of America provided surety bonds to the Fire Districts guaranteeing

Wolverine's performance.  Wolverine ordered the chassis on which it intended to build these fire

trucks from Plaintiff Arthur Glick Truck Sales, Inc.  Per their existing relationship, Wolverine

was expected to pay Plaintiff after selling the completed fire trucks, at which point, Plaintiff was to transfer the manufacturer's certificates to the chassis to the purchasing Fire Districts. Wolverine began constructing the fire trucks but entered into bankruptcy before the trucks were finished.  The Fire Districts filed claims on the surety bonds against Defendant, and Defendant entered into negotiations with Wolverine's bankruptcy estate to secure the release of the unfinished fire trucks.  Defendant acquired the unfinished fire truck for Beaverkill for $42,000 and the unfinished fire truck for Waverly for an undisclosed amount of money.  Defendant then arranged for separate companies to complete the fire trucks and to deliver them to Beaverkill and Waverly, respectively.

Plaintiff has never been paid for the two chassis, nor has Plaintiff transferred the manufacturer's certificates to the chassis to Defendant or to the Fire Districts.  Plaintiff filed suit in state court, asserting that its interest in the chassis under the governing state vehicle registration laws is superior to Defendant's interest, and seeking monetary damages for the chassis plus interest.  Defendant removed to this Court.  Defendant claims to possess a superior interest in the chassis under the UCC.  Defendant moved for summary judgment, and Plaintiff seeks summary judgment as a nonmoving party.  For the reasons stated herein, Defendant's motion for summary judgment is granted, and Plaintiff's request is denied.

## I. Background

### A. Facts

Plaintiff is a New York corporation in the business of selling truck chassis.  (Travelers Casualty & Surety Co. of America's Rule 56.1 Statement of Material Facts ("Def.'s 56.1") ¶ 1; Pl.'s Resp. to Def. Travelers' Rule 56.1 Statement of Material Facts & Pl.'s Rule 56.1 Counter-

Statement of Material Facts ("Pl.'s 56.1") ¶ 1.)[1]  General Electric Capital Corporation ("GECC")

provides Plaintiff with floor plan financing.  (Pl.'s 56.1 ¶ 1.)  Nonparty Wolverine was a

Michigan and Wisconsin corporation in the business of manufacturing fire trucks on chassis and

selling the completed trucks to fire departments and fire districts throughout the country.  (Def.'s

56.1 ¶ 7; Pl.'s 56.1 ¶ 3.)  Defendant is a Connecticut insurance corporation that, inter alia, issues

surety bonds on behalf of companies engaged in the manufacture and sale of fire trucks and

other vehicles, in favor of purchasing fire districts and other municipal departments.  (Def.'s

56.1 ¶¶ 3, 6; Pl.'s 56.1 ¶ 1.)

On October 8, 2007, Wolverine entered into a contract with Beaverkill, located in New

York, for the sale of a completed fire truck for $268,457.  (Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 5.)

Beaverkill paid Wolverine $241,611 as a down payment with the balance to be paid on delivery.

(Def.'s 56.1 ¶ 8; Pl.'s 56.1 ¶ 5.)  As part of the agreement, Defendant issued a surety bond on

behalf of Wolverine to Beaverkill in the amount of $273,936.  (Def.'s 56.1 ¶ 10; Pl.'s 56.1 ¶ 5.)

Put simply, the bond entitled Beaverkill, in the event that Wolverine failed to complete

construction and delivery, to file a claim against Defendant for either the value of the bond or the

delivery of the finished truck.  Almost three months later, on December 26, 2007, Wolverine

entered into a separate contract with Waverly, located in Michigan, for the sale of a completed

fire truck for $159,636.  (Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 10.)  Waverly paid $156,636 as a down

payment.  (Def.'s 56.1, Ex. B.; Pl.'s 56.1 ¶ 10.)  As part of the agreement, Defendant issued a

---

[1] Local Rule 56.1 of the United States District Courts for the Southern and Eastern Districts of New York requires a party seeking summary judgment to submit a statement "of the material facts as to which the moving party contends there is no genuine issue to be tried."  *See also Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 292 (2d Cir. 2000).  The facts recited herein are drawn primarily from these statements—so-called 56.1 statements—and attached documents.

surety bond on behalf of Wolverine to Waverly in the amount of $156,636.  (Def.'s 56.1 ¶ 10.)

Wolverine submitted a purchase order to Plaintiff for a chassis for Beaverkill's fire truck on December 7, 2007, and Wolverine submitted a purchase order for a chassis for Waverly's truck on December 28, 2007.  (Notice of Removal, Ex. A, Exs. D, H.)[2]  Plaintiff, in turn, ordered the chassis from Kenworth Truck Manufacturing Company ("Kenworth") and arranged direct delivery from Kenworth to Wolverine.  (Pl.'s 56.1, Exs. X, Y.)  Kenworth delivered the chassis to Wolverine in Michigan in late 2007 and early 2008, respectively.[3]  Wolverine was to pay Plaintiff for each chassis with the proceeds of the final sale of the completed fire truck—$94,450 for one chassis and $71,850 for the other.[4]  After receiving payment from Wolverine, Plaintiff was to deliver the manufacturer's certificates for the vehicles directly to the Fire Districts.  (Pl.'s 56.1 ¶ 3.)  In other words, Plaintiff was never obligated or expected to transfer those certificates to Wolverine.

---

[2] Between 2007 and 2008, Plaintiff sold multiple truck chassis to Wolverine.  (Pl.'s 56.1 ¶ 3.)  Only the sale of the chassis for Beaverkill and Waverly are at issue here.  The Beaverkill chassis is identified by Vehicle Identification Number ("VIN") 2NKHHN8X89M243581, (Def.'s 56.1, Ex. C ¶ B), and the Waverly chassis is identified by VIN 2NKHHN8X09M242957, (id., Ex. D ¶ B).

[3] There is nothing in the record identifying the actual delivery dates.  The Purchase Order between Plaintiff and Wolverine for the Beaverkill chassis indicates an expected delivery date of January 4, 2008.  (Notice of Removal, Ex. A, Ex. D.)  And the Purchase Order between Plaintiff and Wolverine for the Waverly chassis indicates an expected delivery date of December 28, 2007.  (Id., Ex. A, Ex. H.)

[4] In its 56.1 statement, Plaintiff claims that it was to be paid $94,450 for the Waverly chassis (Pl.'s 56.1 ¶ 10), and $71,850 for the Beaverkill Chassis, (id. ¶ 5).  Plaintiff asserted the reverse in its original complaint in state court—i.e., that Plaintiff was to be paid $94,450 for the Beaverkill chassis and $71,850 for the Waverly chassis.  (Notice of Removal, Ex. A, ¶¶ 11, 17.)  The difference is academic, because this action is for damages for both chassis plus interest.  But in the interest of clarity, the Purchase Orders between Wolverine and Plaintiff reveal that Plaintiff was to be paid $94,450 for the Beaverkill chassis and $71,850 for the Waverly chassis, as Plaintiff claimed in its original complaint.  (Id., Ex. A, Exs. D, H.)

4

In May 2009, Plaintiff apparently became concerned that Wolverine was not expeditiously completing the installation of fire truck bodies on the chassis that Plaintiff had provided.  (Notice of Removal, Ex. A ¶ 9.)  Around this same time, GECC informed Plaintiff that GECC had failed to file financing statements for the chassis that Plaintiff had provided to Wolverine for the Fire Districts and other fire departments.  (*Id.*)[5]  To protect its interest in the chassis, Plaintiff therefore executed a new consignment agreement with Wolverine on June 1, 2009.  (*Id.*, Ex. A., Exs. A, B.)  And as a further protective measure, on June 11, 2009, GECC filed a financing statement with Michigan's Department of State, covering "[n]ew and [u]sed vehicles, whether now owned or hereafter acquired from [Plaintiff] and all proceeds thereof." (Def.'s 56.1, Ex. F.)

Shortly thereafter, on September 8, 2009, before it had completed construction of the fire trucks for the Fire Districts, Wolverine filed for Chapter 11 bankruptcy.  *See Liebzeit v. FVTS Acquisition Co., Inc.* (*In re Wolverine Fire Apparatus Co. of Sherwood Mich.*), 465 B.R. 808, 813 (Bankr. E.D. Wis. 2012).  The bankruptcy was subsequently converted to a Chapter 7 liquidation.  *Id.*  The Fire Districts declared Wolverine in default of its obligations and filed claims against Defendant's surety bonds.  (Notice of Removal, Ex. B, Exs. F, G.)  A receiver and trustee were appointed to administer Wolverine's Chapter 7 bankruptcy estate, and Defendant entered into negotiations with the estate—as well as various other parties to the bankruptcy proceeding which had asserted interests in Wolverine's assets—to obtain possession of the chassis for the Fire Districts.

---

[5] Plaintiff has alleged that per the terms of its floor plan financing arrangement with GECC, Plaintiff was responsible for executing security agreements with Wolverine and other buyers—including UCC-1 financing statements—which GECC was supposed to file with designated state and county recording offices.  (Notice of Removal, Ex. A ¶ 6.)

Defendant and these parties ultimately entered into stipulations regarding the two chassis ("the Beaverkill Stipulation," "the Waverly Stipulation," or collectively, "the Stipulations"). The Beaverkill Stipulation provides that the estate and other creditors "consent to [a] settlement and agree to the release of the chassis to [Defendant] and Beaverkill and claim no interest in the chassis after payment of . . . $42,000 by [Defendant] and agree that any claim or right they had to the chassis itself is released."  (Def.'s 56.1, Ex. C ¶ 3.)   The Waverly Stipulation achieved the same result: the release of the chassis to Defendant.  (Id., Ex. D ¶ 2.)[6]  Plaintiff was not a party to either Stipulation, nor did Plaintiff file any proofs of claim in Wolverine's bankruptcy case asserting Plaintiff's interest in the two chassis.  (Id. ¶ 17).  But the Stipulations acknowledge Plaintiff's potential interest in the chassis and provide that Defendant "shall commence an adversary proceeding . . . to determine the priorities and interest in the chassis of the parties to th[e] Stipulation[s] and of [Plaintiff.]"  (Id., Exs. C ¶ 4, D ¶ 3.)  The Stipulations further state that if the adversarial proceeding were to determine that Plaintiff has a superior interest in the chassis, Defendant would "agree[] to pay any amounts due to [Plaintiff] for its interest in the chassis and to indemnify and hold harmless the other parties to th[e] [S]tipulation[s] of and from any claim by [Plaintiff] seeking recovery of the chassis or damages for [their] removal and delivery to [the Fire Districts]."  (Id., Exs. C ¶ 5, D ¶ 4.)

After obtaining the chassis from Wolverine's bankruptcy estate, Defendant sent the Beaverkill chassis to Stuphen East Corporation ("Stuphen") in New York to complete installation of the fire truck body on the chassis.  (Id. ¶ 18; Notice of Removal, Ex. A ¶ 16.) Stuphen completed installation and delivered the completed fire truck to Beaverkill in 2011.

---

[6] It is not clear from the Waverly Stipulation what amount, if any, Defendant paid to secure the rights to the chassis.

(Pl.'s 56.1 ¶ 18.)  Defendant arranged for another company to complete construction of the

Waverly fire truck; after installation was finished, the truck was delivered to Waverly in 2011.

(Def.'s 56.1 ¶ 18; Pl.'s 56.1 ¶ 18.)  Plaintiff still retains the manufacturer's certificates to both

chassis and has yet to be paid for either.  (Pl.'s 56.1 ¶¶ 7, 15, 19.)

B. Procedural History

Plaintiff and Defendant have now been parties to two adversarial proceedings regarding

the chassis.  First, on February 3, 2011—as anticipated by the Stipulations—Defendant filed a

complaint against Plaintiff in the Eastern District of Wisconsin Bankruptcy Court to determine

the priority of the Parties' respective interests in the chassis.  (Dkt. No. 1 (11-02082 Bankr. E.D.

Wis. Docket).)  Plaintiff moved to dismiss the complaint.  After briefing and argument, the

Honorable Judge Margaret D. McGarity orally granted that motion on June 14, 2011, (Dkt. No.

19 (11-02082 Bankr. E.D. Wis. Docket)), and ordered the case dismissed on June 29, 2011, (Dkt.

No. 22 (11-02082 Bankr. E.D. Wis. Docket)).[7]

Meanwhile, Plaintiff filed the instant lawsuit on April 12, 2011 in the Supreme Court of

the State of New York, Sullivan County, against Defendant and Stuphen, seeking either

possession of the chassis held by Stuphen for Beaverkill and money damages from Defendant for

the chassis held for Waverly or money damages from Defendant for both chassis.  (Notice of

Removal, Ex. A ¶¶ 23–33.)  Defendant filed a Notice of Removal to this Court on April 25,

2011.  (Dkt. No. 1.)  Stuphen was subsequently voluntarily dismissed as a Defendant by a

_____

[7] The bankruptcy court dismissed for jurisdictional reasons, not on the merits.  The court
explained that "even if [it] ha[d] related to jurisdiction," over the dispute, this was an appropriate
case for abstaining to exercise that jurisdiction, because "state law issues predominate over
bankruptcy issues.  It's all state law [and] . . . state law . . . should be adjudicated in state court."
(Dkt. No. 19 (11-02082 Bankr. E.D. Wis. Docket).)  This case followed—filed originally in state
court in New York and removed to this Court.

stipulation between the Parties, after Stuphen delivered the completed fire truck to Beaverkill.
(Dkt. No. 23.)  The voluntary dismissal of Stuphen created complete diversity between the
remaining Parties.  *See Arseneault v. Congoleum*, No. 01-CV-10657, 2002 WL 472256, at *3
(S.D.N.Y. Mar. 26, 2002) ("[U]nder 28 U.S.C. § 1446(b) and *Powers v. Chesapeake & Ohio Ry.
Co.*, 169 U.S. 92 (1898), . . . where the *plaintiff* after instituting the action create[s] complete
diversity by voluntarily dismissing the action as to the non diverse parties, . . . removal
bec[o]me[s] proper." (second, fourth, and fifth alterations in original) (emphasis in original)
(internal quotation marks omitted)).  Plaintiff has withdrawn its Motion To Remand, (Dkt. No.
15), and both Parties now seek summary judgment.  The Parties have further stipulated that "in
the event that . . . Defendant is successful . . . the Court shall direct Plaintiff to turn over
to . . . Defendant the [manufacturer's certificates] to the chassis/vehicles which are the subject
matter" of this suit.  (Dkt. No. 24.)

## II. Discussion

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment should be granted
if the moving party shows that "there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp.
v. Catrett*, 477 U.S. 317, 322–23 (1986).  "A fact is 'material' when it might affect the outcome
of the suit under governing law."  *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d
Cir. 2007) (internal quotation marks omitted).  "When ruling on a summary judgment motion,
the . . . court must construe the facts in the light most favorable to the non-moving party and
must resolve all ambiguities and draw all reasonable inferences against the movant."  *Dall.
Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  A party seeking summary

8

judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir. 2005).

"Where . . . cross motions for summary judgment are filed, [the Court] evaluate[s] each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Byrne v. Rutledge*, 623 F.3d 46, 53 (2d Cir. 2010) (internal quotation marks omitted).  Based on the Parties' 56.1 statements, the Court concludes that summary judgment is appropriate here, because the Parties do not dispute the underlying facts, and the sole issue is a pure question of law:  Does Plaintiff hold a superior interest in the chassis?  *Cf. Litton Indus. Automation Sys., Inc. v. Nationwide Power Corp.*, 106 F.3d 366, 368 (11th Cir. 1997) ("This case involves a pure question of law:  Is Highlander the 'holder of a security interest' which is entitled to priority over the Government's federal tax lien under the Federal Tax Lien Act of 1966 ('FTLA')?" (citation omitted)); *Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d 553, 569 (S.D.N.Y. 2012) (finding summary judgment appropriate where "there [was] no genuine dispute as to any material fact regarding the relative priorities of the interests in the [assets] asserted by the parties").

B. Analysis

1. The Parties' Positions

According to Defendant, the UCC—adopted by all of the relevant jurisdictions, i.e., Michigan, New York, and Wisconsin—governs the Parties' interests and rights to the chassis. Pursuant to the UCC, Plaintiff, a consignor of goods to Wolverine, possessed the equivalent of a purchase-money security interest in the chassis that Plaintiff had delivered to Wolverine.  *See* Mich. Comp. Laws Ann. § 440.9103(2)(b); N.Y. U.C.C. Law § 9-103(b)(2); Wis. Stat. Ann.

§ 409.103(2)(b).[8]  A perfected purchase-money security interest generally has priority over other security interests.  *See* Mich. Comp. Laws Ann. § 440.9324; N.Y. U.C.C. Law § 9-324; Wis. Stat. Ann. § 409.324.  But, according to Defendant, a purchase-money security interest holder must perfect its interest by filing with a recording office within twenty days of delivering goods to a consignee.  *See* Mich. Comp. Laws Ann. §§ 440.9310(1), 440.9317(5); N.Y. U.C.C. Law §§ 9-310(a), 9-317(e); Wis. Stat. Ann. §§ 409.310(1), 409.317(5).  Plaintiff failed to file and, consequently, failed to perfect its security interest.  And due to Plaintiff's failure to file, according to Defendant, Wolverine, as the consignee, legally acquired all rights to and interests in the chassis that Plaintiff had.  *See* Mich. Comp. Laws Ann. § 440.9319; N.Y. U.C.C. Law § 9-319; Wis. Stat. Ann. § 409.319.

Defendant contends that under these circumstances its interest in the chassis is superior to Plaintiff's for two reasons.  First, once Defendant completed its performance obligations under the surety bonds, Defendant became subrogated to the rights and interests of its obligees, the Fire Districts, against Wolverine.  And the Fire Districts, as buyers, possess superior rights to Plaintiff's unperfected purchase-money security interest.  *Se*e Mich. Comp. Laws Ann. § 440.9317(5); N.Y. U.C.C. Law § 9-317(e); Wis. Stat. Ann. § 409.317(5).  According to Defendant, the Fire Districts qualify as "buyers in ordinary course of business"—persons that buy goods "in good faith . . . from a person . . . in the business of selling goods of that kind." Mich. Comp. Laws Ann. § 440.1201(9); N.Y. U.C.C. Law § 1-201(9); Wis. Stat. Ann. § 401.201(2)(em).  Buyers in the ordinary course take goods free from any "security interest

---

[8] Each of Michigan, New York, and Wisconsin has adopted Article 9 of the UCC. Throughout this Opinion, the Court cross cites the Michigan, New York, and Wisconsin statutory sections that codify the relevant UCC section.

created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."  Mich. Comp. Laws Ann. § 440.9320(1); N.Y. U.C.C. Law § 9-320(a); Wis. Stat. Ann. § 409.320(1).

Second, under operation of the Bankruptcy Code, the trustee of Wolverine's bankruptcy estate possessed the rights and interests of an ideal lien creditor against the estate.  *See* 11 U.S.C. § 544(a)(1); *Kraken Inv. Ltd. v. Jacobs* (*In re Salander-O'Reilly Galleries, LLC*), 475 B.R. 9, 22 (S.D.N.Y. 2012) ("'Section 544 [] thus puts the trustee in the position of an ideal lien creditor, armed with a judgment and with all the power that state law confers on such ideal creditors.'" (alteration in original) (quoting *Musso v. Ostashko*, 468 F.3d 99, 105 (2d Cir. 2006))). Defendant, pursuant to its Stipulations with the bankruptcy estate's trustee, receiver, and secured creditors, obtained that interest.  (Def.'s 56.1, Exs. C ¶ 3, D ¶ 2.)  Under the UCC, a lien creditor's interest in property is superior to an unperfected purchase-money security interest. *See* Mich. Comp. Laws Ann. § 440.9317(5); N.Y. U.C.C. Law § 9-317(e); Wis. Stat. Ann. § 409.317(5).

Plaintiff counters that Defendant has misidentified the governing law:

Michigan law, and no other law, applies to the delivery and consignment of the Kenworth trucks by [Plaintiff] to Wolverine in Michigan.  New York law and Michigan law apply, respectively to [Defendant's] delivery of the finished product fire engines to [Beaverkill in New York] and to [Waverly] in Michigan. The UCC does not apply under these circumstances in New York or in Michigan.

(Pl.'s Mem. of Law for Summ. J. 8.)  Both New York and Michigan have enacted specific vehicle registration statutes.[9]  Plaintiff contends that under these respective laws, it retains a superior interest—indeed, the only valid interest—in the chassis.

---

[9] The Court uses the phrases "vehicle registration statutes" and "certificate-of-title statutes" interchangeably.

With respect to the Beaverkill chassis, Plaintiff arranged for direct delivery from Kenworth to Wolverine in Michigan, but Plaintiff never transferred the certificate of title to the chassis to Wolverine, Defendant, or Beaverkill.  Accordingly, under New York law, none of these parties ever possessed or currently possesses a lawful interest in the chassis.  *See* N.Y. Veh. & Traf. Law § 2113(a) (stating that to transfer an interest in a vehicle "other than by the creation of a security interest," an owner "shall, at the time of the delivery of the vehicle, execute an assignment and warranty of title to the transferee in the space provided therefor on the certificate . . . and cause the certificate and assignment to be mailed or delivered to the transferee"); *People v. Reyes*, 499 N.Y.S.2d 321, 323 (N.Y. Sup. Ct. 1986) ("New York law is very specific in its requirements concerning motor vehicle ownership and transfer.  Private owners of motor vehicles must obtain certificates of title *in their own names*.  To transfer ownership, the vehicle owner must execute a written assignment of title on the certificate of tile itself." (emphasis in original) (citation omitted)).  Accordingly, Plaintiff asserts, none of Wolverine, Defendant, or Beaverkill qualifies as a buyer in the ordinary course, because none investigated the chain of title to determine Plaintiff's prior interest.

Plaintiff makes essentially the same argument with respect to the Waverly chassis: Plaintiff arranged for delivery of the chassis to Wolverine in Michigan but never transferred the certificate of title to Wolverine, Defendant, or Waverly.  Therefore, under Michigan law, none of these entities possesses a lawful interest in the chassis.  *See* Mich. Comp. Laws Ann. §§ 257.222(4), .224, .233, .234; *see also Allstate Ins. Co. v. Demps*, 348 N.W.2d 720, 723 (Mich. Ct. App. 1984) ("Michigan courts have held that the sale of a motor vehicle which did not include a transfer of certificate of title as required by law was void, such that the vendor remained the owner of the vehicle.").  Plaintiff therefore concludes that Wolverine, Defendant,

and Waverly all fail to qualify as buyers in the ordinary course for failing to investigate Plaintiff's prior and superior interest in the chassis.

2. Analysis

As a threshold matter, the Court must determine whether the Parties' interests are governed by Article 9 of the UCC or by Michigan's, New York's, and Wisconsin's vehicle registration statutes.[10]  Then, after identifying the governing law, the Court must assess whose interest is superior.  As the Court will explain, regardless of whether Michigan, New York, or Wisconsin law applies to the various transactions involving the chassis, the result remains the same:  The UCC governs the Parties' interests in the chassis, and Defendant acquired the chassis on behalf of the Fire Districts free of Plaintiff's interest—although not for the reasons argued by Defendant.[11]

_____

[10] Although not cited by Plaintiff, the Court notes that Wisconsin also has adopted a vehicle certificate-of-title statute.  *See* Wis. Stat. Ann. §§ 342.19, 342.20.

[11] It is unnecessary to engage in a full choice-of-law analysis to resolve this dispute.  "A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012). "'Choice of law does not matter, however, unless the laws of the competing jurisdictions are actually in conflict.'"  *Greenstreet Fin., L.P. v. GS-Graces, LLC*, No. 07-CV-8005, 2011 WL 7555324, at *7 (S.D.N.Y. Apr. 18, 2011) (quoting *Int'l Bus. v. Liberty Mut.*, 363 F.3d 137, 143 (2d Cir. 2004)).  "Under New York law, 'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'"  *Id.* (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006)).

Here, as the Court will demonstrate, there are "no substantive difference[s] . . . in the law[s] governing perfection and priority of security interests" among Michigan, New York, and Wisconsin—all of which have adopted the amended UCC; "the Court will [therefore] dispense with" a full choice of law analysis.  *Id.*; *see also United States v. 328 Pounds, More or Less, of Wild Am. Ginseng* ("*328 Pounds of Ginseng*"), 347 F. Supp. 2d 241, 246 (W.D.N.C. 2004) ("Given that each state has adopted the U.C.C., and the Court finds its application, as adopted in both states, as determinative of the motions before it, it is unnecessary to determine at this time which state's laws govern the transactions at issue here.").

(a) The Legal Framework

Plaintiff is correct that, as a general matter, Michigan's, New York's, and Wisconsin's certificate-of-title laws govern the sale of vehicles and establish that a valid transfer of ownership occurs only if the seller transfers the vehicle's certificate of title to the buyer.  But these laws do not trump, or conflict with, the UCC, as these laws are expressly incorporated into the UCC as amended in 2001.  Specifically, section 310 of Article 9 of the UCC provides that filing a financing statement "is not necessary to perfect . . . a security interest in" property subject to certain state statutes described in section 311.  Mich. Comp. Laws Ann. § 440.9310(2)(c); N.Y. U.C.C. Law § 9-310(b)(3); Wis. Stat. Ann. § 409.310(2)(c).  Section 311 then provides that "*except as otherwise provided in* [*this*] *section*," the filing of a financing statement is not necessary to perfect a security interest in property, inter alia, that is governed by a state certificate-of-title statute.  *See* Mich. Comp. Laws Ann. § 440.9311(1)(b)(I) (emphasis added); N.Y. U.C.C. Law § 9-311(a)(2) (emphasis added); Wis. Stat. Ann. § 409.311(1)(b) (emphasis added).  Unsurprisingly, section 311 then concludes by describing when filing a financing statement is required to perfect a security interest in property governed by a certificate-of-title statute: "[d]uring any period in which collateral subject to" the certificate-of-title law "is inventory held for sale . . . by a person . . . in the business of selling goods of that kind."  *See* Mich. Comp. Laws Ann. § 440.9311(4); N.Y. U.C.C. Law § 9-311(d); Wis. Stat. Ann. § 409.311(4).  Comment 4 to section 311 further illuminates the perfection rule for inventory subject to a certificate-of-title statute:

> [P]erfection of a security interest in the inventory of a person in the business of selling goods of that kind is governed by *the normal perfection rules, even if the inventory is subject to a certificate-of-title statute.  Compliance with a certificate-of-title statute is both unnecessary and ineffective to perfect a security interest in inventory* [*sold by a person in the business of selling goods of that kind.*] Thus, a

14

> secured party who finances an automobile dealer that is in the business of selling and leasing its inventory of automobiles can perfect a security interest in all the automobiles by filing a financing statement *but not by compliance with a certificate-of-title* statute.

Mich. Comp. Laws Ann. § 440.9311 cmt. 4 (emphasis added); N.Y. U.C.C. Law § 9-311 cmt. 4 (emphasis added); Wis. Stat. Ann. § 409.311(4) cmt. 4 (emphasis added).[12]

This case presents a prototypical UCC fact pattern:  The relevant provisions, sections 310 and 311 of Article 9, establish a rule, an exception to that rule, and an exception to the exception.[13]  The rule is that a financing statement must be filed with a state recording office to perfect a security interest in property; the exception to the rule is that a financing statement need not be filed to perfect a security interest if the collateral is subject to a state certificate-of-title statute; and the exception to the exception is that a financing statement must be filed if the collateral that is subject to the state certificate-of-title statute is held as inventory by a seller of goods of that kind.  Plaintiff apparently identified the exception to the rule but failed to account for the exception to the exception.

---

[12] The Practicing Law Institute's primer on inventory financing is to the same effect:

> Generally, each state has a certificate of title law that applies to motor vehicles . . . as defined in each state's certificate of title law.  The certificate of title laws vary from state to state.  Under Article 9, the UCC defers to these certificate of title laws for perfection purposes. . . .  There is one exception to this rule, however.  Article 9 provides certificate of title laws do not apply to inventory held for sale or lease by a person in the business of selling goods of this kind.  This collateral constitutes inventory governed by Article 9 not by certificate of title law.

R. Marshall Grodner & McGlinchey Stafford, *Primer on Financing Inventory: Back to the Basics*, 949 PLI/Comm 171, 186 (2012) (footnotes omitted).

[13] The Court sincerely apologizes to any attorneys who experienced Bar Exam–related PTSD reading the preceding sentence.

15

Plaintiff cites several state court decisions for the proposition that New York's and Michigan's certificate-of-title statutes trump conflicting UCC provisions governing the priority of interests.  For example, Plaintiff relies heavily on *Kaminsky v. Karmin*, 589 N.Y.S.2d 588 (App. Div. 1992).  In that case, an owner sold his vehicle on consignment to a used car dealership without transferring the certificate of title to the dealership.  The dealership then sold the vehicle to the plaintiff, who took the vehicle under a temporary certificate of registration. The vehicle's original owner rejected payment from the dealership, which had sold the vehicle to the plaintiff for less than the price to which the owner had agreed; the dealership went into bankruptcy; the owner demanded that Plaintiff return the vehicle; and Plaintiff sought relief from the New York state courts.  The Second Department declared the original owner to have the superior interest in the vehicle, explaining that because the owner had "never delivered the Certificate of Title to [the dealership], . . . the subsequent transfer of the vehicle to the plaintiff pursuant to the consignment agreement between the defendant . . . and [the dealership] was in violation of Vehicle and Traffic Law § 2113 (a)."  *Id.* at 590.  Plaintiff also directs the Court to similar decisions from Michigan establishing that a sale of a vehicle without the transfer of the certificate of title is void, and that a vehicle buyer cannot seek comfort within the folds of the UCC.  *See, e.g.*, *Whitcraft v. Wolfe*, 384 N.W.2d 400, 404 (Mich. Ct. App. 1985).

The Court cannot escape concluding, however, that decisions to this effect, whether from New York, Michigan, or Wisconsin, were outliers at the time that have been superceded by more recent amendments to the UCC.  In 2001, several years after *Kaminsky*, New York enacted amendments to Article 9 of the UCC clarifying a consignor's interest in collateral held as inventory by a seller of that kind of goods.  *See* 2001 N.Y. Sess. Laws ch. 84 (S. 5404-A) (West).  Michigan enacted these same amendments in 2000, *see* 2000 Mich. Legis. Serv. P.A.

16

348 (H.B. 5228) (West), and Wisconsin, like New York, enacted them in 2001, *see* 2001-2002 Wis. Legis. Serv. Act 10 (2001 S.B. 9) (West).  After several rounds of briefing, Plaintiff still has not cited, and the Court has been unable to find, a single decision from any state or federal court, postdating the adoption of these amendments, stating or suggesting that a state certificate-of-title statute's requirements trump the UCC's filing requirements with respect to a consignor's interest in collateral held as inventory.[14]  There are, however, decisions from these jurisdictions establishing the primacy of the UCC with respect to such collateral.  *See, e.g.*, *Genesee Regional Bank v. Palumbo*, 799 N.Y.S.2d 883, 889 (Sup. Ct. 2005) ("Vehicles owned by car dealers and held for sale are exempt from application of the Uniform Vehicle Certificate of Title Act.").  This evolution is hardly surprising, as it appears that the relevant amendments to Article 9 were drafted in part to clarify the interplay of the UCC and state certificate-of-title statutes.  *See* Larry T. Bates, *Certificates of Title in Texas Under Revised Article 9*, 53 Baylor L. Rev. 735, 740–41 (2001) (noting that the drafting committee "had to accept the existence of competing systems for titled collateral and find a way to integrate the [certificate-of-title] acts into Revised Article 9").

Put simply, Wolverine was in the business of selling fire trucks to fire districts when Plaintiff ordered the chassis for Wolverine, and when Kenworth delivered the chassis to

---

[14] Plaintiff cites *Continental Insurance Co. v. Biondo*, 857 N.Y.S.2d 588, 588 (N.Y. App. Div. 2008).  But that decision does not support Plaintiff's position.  There, the Second Department found that a vehicle owner had failed to transfer title to the vehicle under New York's certificate-of-title statute, because the owner had merely delivered possession of the vehicle "pursuant to a bailment or consignment agreement," without transferring title.  *Id.* at 589.  But that court also expressly found that the owner had sold the vehicle to a specific individual, and that there was no evidence that the individual was an employee of a vehicle vendor.  *Id.*  Because the car was not being held as inventory, there was no reason for the court to consider whether the UCC's filing requirements applied to the sale of the vehicle.

Wolverine.  Wolverine possessed both chassis as inventory for sale to the Fire Districts.  The Court therefore concludes that the UCC's normal perfection rules govern the Parties' respective interests in the chassis—the certificate-of-title statutes notwithstanding.  *See* Mich. Comp. Laws Ann. §§ 440.9310–.9311; N.Y. U.C.C. Law §§ 9-310–9-311; Wis. Stat. Ann. §§ 409.310–.311.[15]

<u>(b) Defendant's Status as a Buyer</u>

As a consignor, Plaintiff possessed a purchase-money security interest in the two chassis at the time of delivery in late 2007 and early 2008.[16]  *See* Mich. Comp. Laws Ann § 440.9103(2); N.Y. U.C.C. Law § 9-103(b); Wis. Stat. Ann. § 409.103(2).  To perfect its security interest, Plaintiff had to file a financing statement with a state recording agency.  *See* Mich. Comp. Laws Ann. § 440.9310(1); N.Y. U.C.C. Law § 9-310(a); Wis. Stat. Ann. § 409.310(1).  There is no dispute that Plaintiff did not file a financing statement asserting an interest in Wolverine's inventory until June 11, 2009.  (Def.'s 56.1, Ex. F.)

Defendant claims that Plaintiff missed its chance to perfect its interest in the chassis, because a purchase money security interest must be filed within twenty days of delivery. Therefore, Defendant concludes, Plaintiff possesses nothing more than an unperfected security

---

[15] Because the Court concludes that the UCC provides the governing framework for evaluating the Parties' interests, the Court need not address Defendant's arguments that the chassis are excluded from coverage under the state certificate-of-title statutes, either because the chassis are not vehicles, or because they are emergency vehicles.  For the same reason, the Court does not address the two arguments that Defendant brought up for the first time during oral argument only to abandon in the postargument round of briefing—that the manufacturer's certificates, which Plaintiff possesses, are not equivalent to a certificates of title for the purposes of state certificate-of-title laws; and that, under New York law, an individual can assert a superior interest in a vehicle, absent possession of a certificate of title, by demonstrating a possessory interest in, and control of, that vehicle.

[16] As noted, the record does not reveal the specific dates on which the chassis were delivered.

18

interest in the chassis.  But Defendant's conclusion is based on a misreading of the UCC.

Section 317, on which Defendant relies, provides that

> if a person files a financing statement with respect to a purchase-money
> security interest before or within 20 days after the debtor receives delivery
> of the collateral, the security interest takes priority over the rights of a
> buyer, lessee, or lien creditor . . . aris[ing] between the time the security
> interest attaches and the time of filing.

Mich. Comp. Laws Ann. § 440.9317(5) ; N.Y. U.C.C. Law § 9-317(e); Wis. Stat. Ann.

§ 409.317(5).  Section 317 vests special protections in the holder of a purchase-money security

interest *if* the holder files within twenty days, but nothing in this section expressly or implicitly

establishes a hard-edged temporal limit on *when* a holder can perfect a purchase-money security

interest.  *See AG Venture Fin. Servs., Inc. v. Montagne* (*In re Montagne*), 417 B.R. 214, 227 n.13

(Bankr. D. Vt. 2009) (explaining that the twenty-day window in section 317 is a "'grace period,'

not a deadline"); *see also Fleet Capital Corp. v. Sutherland Presses* (*In re Enter. Indus., Inc.*),

259 B.R. 163, 166 (Bankr. N.D. Cal. 2001) (explaining that effect of filing within the twenty-day

window is to protect a purchase money security interest against a "competing non-purchase

money secured creditor who was first to file").  Therefore, the Court concludes that Plaintiff

perfected its interest on June 11, 2009, when it filed a financing statement in Michigan.

But Plaintiff's filing is not dispositive of the Parties' interests.  Upon delivery of the

chassis to Wolverine and throughout the period in which Plaintiff's security interest was

unperfected, Wolverine is deemed to have possessed "rights and title to the [chassis] identical to

those [Plaintiff] had"—including the right to sell the chassis to buyers.  Mich. Comp. Laws Ann.

§ 440.9319(1); N.Y. U.C.C. Law § 9-319(a); Wis. Stat. Ann. § 409.319(1); *see also In re*

*Salander-O'Reilly Galleries*, 475 B.R. at 23 ("Thus [when a consignor fails to perfect,] the

debtor is deemed to have acquired the consignor's rights to allow a security interest to attach to

the consigned item[s] . . . ."). Wolverine's "identification" of these two chassis to its contracts

with Beaverkill and Waverly during this period was therefore lawful and created rights in the

Fire Districts as buyers. *See* Mich. Comp. Laws Ann. §§ 440.2401(1), 440.2501(1); N.Y. U.C.C.

Law §§ 2-401(1), 2-501(1); Wis. Stat. Ann. §§ 402.401(1), 402.501(1).[17]  Defendant may assert

---

[17] The issue of when the two chassis were identified to Wolverine's contracts with the Fire Districts, such that the Fire Districts acquired rights in the chassis, is surprisingly nuanced and was barely addressed by the Parties.  But a brief review of the UCC, the sequence of events preceding Wolverine's bankruptcy, and persuasive caselaw reveals the bottom line:  At the very latest, the Fire Districts' rights arose at some point in early 2008, before Plaintiff perfected its purchase-money security interest and, consequently, during a period when Wolverine had the right to transfer title to the chassis.

It is clear at the outset that Wolverine's contracts with the Fire Districts did not identify the chassis.  Identification is tied to the execution of a contract only if the contract is for the sale of "goods already existing and identified," as opposed to "future goods."  *See* Mich. Comp. Laws Ann. § 440.2501(1); N.Y. U.C.C. Law § 2-501(1); Wis. Stat. Ann. § 402.501(1).  There is an argument that Wolverine's contracts with the Fire Districts could be considered contracts for "existing" goods.  At the time of execution, there were no completed fire trucks; both contracts merely state that Wolverine was to order Kenworth model chassis and construct complete fire trucks on them.  (Def.'s 56.1 Exs. A, B.)  But, as a general matter, goods can qualify as "existing" despite the fact that the seller has not yet completed installation and manufacturing. *See* Mich. Comp. Laws Ann. § 440.2501 cmt. 4; N.Y. U.C.C. Law § 2-501 cmt. 4; Wis. Stat. Ann. § 402.501 cmt. 4 ("[T]here is no requirement in this section that the goods be in deliverable state or that all of the seller's duties with respect to the processing of the goods be completed in order that identification occur."); *see also Gonsalves v. Montgomery*, No. 06-CV-2747, 2006 WL 2711540, at *6-8 (N.D. Cal. Sept. 20, 2006) (collecting authority for the proposition that partially manufactured goods can qualify as existing).

Be that as it may, however, the contracts clearly do not refer to "identified" goods.  At the time of contract execution, the Fire Districts did not view the chassis, nor did Wolverine provide respective VIN or other identification references in the contracts.  The contracts at issue were therefore for "future goods."  *See Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht Hull No. 01*, 625 F.2d 44, 46 (5th Cir. 1980) (finding that identification had unquestionably occurred after, inter alia, a boat was identified to buyers by hull number, buyers carried out an "inspection and trial sail" of the boat, and buyers "selected numerous options" including "interior fabric and carpet selections"); *Daniel v. Bank of Hayward*, 425 N.W.2d 416, 417, 422-23 (Wis. 1988) (finding that identification of a vehicle had not yet occurred, because it "had not yet been manufactured," and because the sales contract "did not set forth the vehicle identification number"); *Holstein v. Greewich Yacht Sales, Inc.*, 404 A.2d 842, 844 (R.I. 1979) (finding that a boat was identified to a contract where the parties viewed it at Defendant's yard "and the parties specifically referred to it as hull '# 551' in the sales contract").

Because the contracts were for future goods, under the UCC, identification occurred

those rights as the Fire Districts' subrogee. *See, e.g.*, *In re RLI Ins. Co. v. N.Y. State Dep't of Labor*, 766 N.E.2d 934, 940 (N.Y. 2002) ("[T]his Court has long held that a completing surety succeeds under equitable subrogation principles to all rights that the obligee/owner has against the contractor . . . ."); *Morrow v. Shah*, 450 N.W.2d 96, 99 (Mich. Ct. App. 1990) ("Regardless of whether a right of subrogation arises by operation of law or by contractual agreement, the controlling general principles are the same: the subrogee, upon paying an obligation owed to the subrogor as the primary responsibility of a third party, is substituted in the place of the subrogor, thereby attaining the same (and no greater) rights to recover against the third party."); *Garrity v.*

---

"when [the] goods [we]re shipped, marked or otherwise designated by the seller as [the] goods to which the contract refers." Mich. Comp. Laws Ann. § 440.2501(1)(b); N.Y. U.C.C. Law § 2-501(1)(b); Wis. Stat. Ann. § 402.501(1)(b). "The determination of whether a seller has identified, shipped, marked, or otherwise designated goods under § 2-501, as the goods to which a contract refers, is a 'fact intensive inquiry that turns upon the specific manner in which the seller conducts its business.'" *328 Pounds of Ginseng*, 347 F. Supp. 2d at 247 (quoting *Hold-Trade Int'l, Inc. v. Adams Bank & Trust* (*In re Quality Processing, Inc.*), 9 F.3d 1360, 1364 (8th Cir. 1993)); *see also United States v. Long*, 706 F.2d 1044, 1049 (9th Cir. 1983) (finding that identification had occurred based on "[t]he past course of conduct followed by [the parties] in the purchase and sale of meat"). After executing the sales contracts with the Fire Districts, Wolverine submitted purchase orders to Plaintiff. Each purchase order provides the name of the purchasing Fire District as well as that District's specifications—for example, the chassis's color, wheelbase size, and other measurements. (Notice of Removal, Ex. A, Exs. D, H.) Subsequently, Plaintiff submitted purchase orders to Kenworth to arrange delivery of appropriate chassis to Wolverine. (Pl.'s 56.1, Exs. X, Y.) Kenworth then delivered the two chassis to Wolverine in late 2007 and early 2008, and, shortly thereafter, Wolverine began constructing fire trucks on the chassis according to the Fire Districts' specifications. (Def.'s 56.1 ¶ 11.) At this point, at the very latest, the chassis were identified to the contracts. *See Mitchell v. Transamerica Commercial Fin. Corp.* (*In re Doughty's Appliance, Inc.*), 236 B.R. 407, 416 (Bankr. D. Or. 1999) (finding that goods held by debtor as inventory were identified to specific contracts if the goods either had been tagged for specific buyers or corresponded to sales orders specifying "manufacturer, model number, SKU number, description and color"); *see also Jones*, 625 F.2d at 46 (finding identification occurred after a boat was identified by hull number, and buyers selected specifications); *Holstein*, 404 A.2d at 844 (finding that a boat was identified where the parties to the contract specifically referred to it by number).

*Rural Mut. Ins. Co.*, 253 N.W.2d 512 (Wis. 1977) (same).[18]

Whether the Fire Districts' rights included the right to receive the chassis free from Plaintiff's subsequently perfected purchase-money security interest is governed by "Sections []317, []315, and []320 [of the UCC]."  Mich. Comp. Laws Ann. § 440.9319 cmt. 2; N.Y. U.C.C. Law § 9-319 cmt. 2; Wis. Stat. Ann. § 409.319 cmt. 2.  Section 315 establishes the general rule that "a security interest . . . continues in collateral notwithstanding sale."  Mich. Comp. Laws Ann. § 440.9315(1)(a); N.Y. U.C.C. Law § 9-315(a)(1); Wis. Stat. Ann. § 409.315(1)(a); *see also Havens Steel Co. v. Commerce Bank, N.A.* (*In re Havens Steel Co.*), 317 B.R. 75, 80 (Bankr. W.D. Mo. 2004) ("[T]he general rule [is] that a secured party's interest in collateral continues upon the sale of the collateral unless . . . one of the provisions in Article 9 under which a party takes free and clear of the security interest applies.").  Section 317 then provides that, the general rule notwithstanding, "a buyer . . . of . . . goods . . . takes free of a security interest . . . if the buyer gives value and receives delivery of the collateral without knowledge of the security interest . . . and before it is perfected."  Mich. Comp. Laws Ann. § 440.9317(2); N.Y. U.C.C. Law § 9-317(b); Wis. Stat. Ann. § 409.317(2).  And section 320 establishes the special protections available to a buyer in the ordinary course:  "[A] buyer in ordinary course of business . . . takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence."  Mich. Comp. Laws Ann.

---

[18] There does not appear to be any express subrogation provision in the surety performance bonds Defendant executed on behalf of Wolverine to Beaverkill or Waverly.  This omission is not fatal to Defendant's position, however.  As just noted, Michigan, New York, and Wisconsin law recognize subrogation as both a contractual and equitable principle.  Moreover, Plaintiff has not challenged Defendant's asserted subrogation of the Fire Districts' rights.

§ 440.9320(1); N.Y. U.C.C. Law § 9-320(a); Wis. Stat. Ann. § 409.320(1).[19]

Taken together, these provisions make clear that if the Fire Districts qualify as buyers, but not as buyers in the ordinary course of business, then Plaintiff's interest is superior to Defendant's.  Here, the Fire Districts did not "receive[] delivery of the collateral . . . before [Plaintiff's security interest] [was] perfected," as they received the chassis at some point in 2011. (Def.'s 56.1 ¶ 19; Pl.'s 56.1 ¶ 18.)  Plaintiff perfected its security interest on June 11, 2009. (Def.'s 56.1 ¶ 12, Ex. F.)  If, however, the Fire Districts qualify as buyers in the ordinary course, then they received the chassis in 2011 free of Plaintiff's perfected purchase-money security interest.  As noted, the UCC defines a buyer in the ordinary course of business as "a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the good, and in the ordinary course from a person . . . in the business of selling goods of that kind."  Mich. Comp. Laws Ann. § 440.1201(9); N.Y. U.C.C. Law § 1-201(9); Wis. Stat. Ann. § 401.201(2)(em).  The Fire Districts satisfy this definition.  Plaintiff does not dispute that Wolverine was in the business of selling completed fire trucks.  And Plaintiff's challenges based on the other statutory requirements are unpersuasive.

Plaintiff's first argument is that the Fire Districts cannot be buyers in the ordinary course, because they did not take title to the goods in question.  This argument is incorrect as a matter of

---

[19] Here, the relevant security interest was created by Plaintiff, the seller's consignor, not by Wolverine, "the buyer's seller."  But this distinction appears to be irrelevant, and Plaintiff does not argue otherwise.  Plaintiff delivered the chassis in which it had a purchase-money security interest to Wolverine, a merchant that sells goods of that kind.  Under the UCC, Plaintiff thus "entrust[ed]" the chassis to Wolverine.  *See* Mich. Comp. Laws Ann. § 440.2403; N.Y. U.C.C. Law § 2-403; Wis. Stat. Ann. § 402.403.  And accordingly, a buyer in the ordinary course from Wolverine would have a superior interest both to Wolverine's interest and to Plaintiff's.  *See, e.g.*, Mich. Comp. Laws Ann. § 440.9320 cmt. 3, Example 2; N.Y. U.C.C. Law § 9-320 cmt. 3, Example 2; Wis. Stat. Ann. § 409.320 cmt. 3, Example 2.

Michigan, New York, and Wisconsin law.  Wisconsin's highest court has expressly held that a buyer becomes a buyer in the ordinary course upon "identification" of goods to a contract as opposed to upon transfer of title.  *See Daniel*, 425 N.W.2d at 417 ("We conclude that the purchasers . . . became buyers in the ordinary course of business when the vehicle was identified to the contract.").  Michigan's highest court and New York's highest court have not so held, but that fact is not the end of the matter.  "Where the substantive law of the [governing] state[s] is uncertain or ambiguous, the job of the federal courts [sitting in diversity] is carefully to predict how the highest court[s] of the . . . state[s] would resolve the uncertainty or ambiguity." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994); *see also Caudle v. Towers, Perrin, Forster & Crosby, Inc.*, 580 F. Supp. 2d 273, 281 (S.D.N.Y. 2008) (noting that a federal court sitting in diversity "must predict how the highest court[s] of the state[s] would resolve [the] open question of state law").  In making such a prediction, the federal court should, inter alia, employ traditional tools of statutory interpretation—i.e., recourse to legislative history, context, and purpose; should give "proper regard to relevant rulings of other courts of the State"; and should consider "relevant cases from [other] jurisdictions."  *Travelers Ins. Co.*, 14 F.3d at 119.

Based on these considerations, the Court concludes that both Michigan's and New York's highest court likely would hold that buyers obtain buyer-in-the-ordinary-course status upon identification of goods to a contract rather than upon contract formation, transfer of title, delivery of goods, or acceptance of goods.  The majority of courts that have addressed this question have so held based on the text and policy underpinnings of the UCC.  *See, e.g.*, *Daniel*, 425 N.W.2d at 421–23 (adopting identification as the moment when buyer becomes buyer in the ordinary course, because "[r]eliance on the concept of title is contrary to the thrust of the

24

[UCC]"; because "the inventory financer is better able to guard against the risks inherent in this type of financing than is the average retail buyer"; because identification better reflects "the customary manner in which sales are made" and the expectations of buyers and sellers; and because buyers' rights accrue under the UCC upon identification); *In re Havens Steel Co.*, 317 B.R. at 82–83 (concluding that buyer-in-the-ordinary-course status attaches upon identification based on the UCC's structure and context, the "trend in the case law away from transfer of title as the point at which [buyer-in-the-ordinary-course] status is attained," and "Article 9's policy of protecting innocent buyers and plac[ing] the risk of loss on the secured party who has the ability to protect itself"); *In re Doughty's Appliance, Inc.*, 236 B.R. at 414 (adopting the approach of "the majority of modern decisions reject[ing] a transfer of title requirement for the application of [the UCC] for the benefit of a buyer in the ordinary course of business").

Moreover, with respect to Michigan, it appears that the highest court has already moved away from linking a buyer's rights to the transfer of title.  For example, the Michigan Court of Appeals recently relied on a Michigan Supreme Court decision allowing a buyer that had performed his obligations under a purchase contract to compel transfer of title.  *See Commercial Servs. of Perry v. DEK Auto.*, No. 289827, 2010 WL 1138042, at *2 (Mich. Ct. App. Mar. 25, 2010) ("The buyer, 'having fulfilled his obligations under the purchase agreement with the dealer, was entitled to have the dealer obtain the certificate of origin and deliver it to him so that he could apply for and obtain a title.'" (quoting *Ladd v. Ford Consumer Fin. Co., Inc.*, 586 N.W.2d 404, 404 (Mich. 1998)).  The Court therefore anticipates that the Michigan Supreme Court would adopt identification as the moment when buyer-in-the-ordinary-course status attaches.

With respect to New York, the appellate courts have admittedly been inconsistent in

25

addressing whether the transfer of title is necessary for a buyer to become a buyer in the ordinary

course.  *Compare Palumbo*, 799 N.Y.S.2d at 890 ("Although pursuant to Section 9-320(a) the

transfer of title to a buyer in the ordinary course of business takes free of a security interest

created by the buyer's seller, that rule is not applicable where, as here, the title was never

transferred."), *and Integrity Ins. Co. v. Marine Midland Bank-Western*, 396 N.Y.S.2d 319, 321

(Sup. Ct. 1977) (noting that buyer acquires buyer-in-the-ordinary-course protections upon

transfer of title, even if buyer does not obtain possession), *with Cont'l Ill. Nat'l Bank & Trust

Co. of Chi. v. Tacoma Boatbuilding Co.* (*In re Tacoma Boatbuilding Co.*), 158 B.R. 19, 24

(S.D.N.Y. 1993) ("New York law also rejects title as determinative of when a buyer becomes a

[buyer in the ordinary course]." (citing *Chrysler Credit Corp. v. Sharp*, 288 N.Y.S.2d 525, 529

(N.Y. Sup. Ct. 1968)), *and Chrysler Credit Corp.*, 288 N.Y.S.2d at 534 (holding that under the

UCC "a buyer who makes a purchase on a printed form contract in good faith with a full

understanding it is a binding contract, who knowingly signs a retail installment payment

obligation and trades in an old car in addition must, certainly as to a retail financer furnishing

new value on the strength of such contract and as to an entruster giving the dealer wide latitude

of sale goods, be deemed a buyer in the ordinary course of business, without regard to the

technicalities of when title is to pass").  But the fact that New York courts have reached

inconsistent decisions merely deprives the Court of one tool for prognostication.  Other

"resources"—most notably, the UCC's statutory context and purpose as well as decisions from

other jurisdictions, as discussed above—allow the Court to reach a prediction:  The Court of

Appeals also likely would find that identification, rather than acquisition of title, is necessary for

a buyer to become a buyer in the ordinary course.

      Plaintiff's next argument is that the Fire Districts—and by extension, Defendant—did not

buy the fire trucks in good faith.  As a general matter, a buyer acts in good faith by demonstrating "honesty in fact in the conduct or transaction concerned."  Mich. Comp. Laws Ann. § 440.1201(19); N.Y. U.C.C. Law § 1-201(19); Wis. Stat. Ann. § 401.201(2)(k).  A buyer bears the burden of demonstrating good faith, but, in the absence of allegations to the contrary, there is a presumption of good faith in commercial transactions.  *See In re Havens Steel Co.*, 317 B.R. at 82 n.6 ("Although [the buyer] bears the burden of proof . . . good faith is difficult to prove in the affirmative.  It is similar to proving the negative—we were not dishonest.  Accordingly, in the absence of allegations or evidence to the contrary, the Court will infer [the buyer's] good faith in its conduct . . . .").  The Parties appear to disagree as to at what point the nature of a buyer's faith should be assessed.  Plaintiff implicitly suggests that the Fire Districts' honesty must be judged at the time of contract execution and/or at the time of delivery; Defendant suggests the relevant moment is "identification."[20]  The difference, however, is immaterial.  At all points, the Fire Districts indisputably acted in good faith.

Plaintiff's position is that the Fire Districts did not purchase the chassis in good faith at the time of execution, because they purchased the fire trucks without investigating the chain of title to the chassis.  Plaintiff again relies on *Kaminsky*, 589 N.Y.S.2d at 589, in which the court held that a buyer who "purchas[ed] [a] vehicle without inspecting the records of title and prior ownership to the vehicle," was not a buyer in the ordinary course.  But Plaintiff's theory is unpersuasive.  First, *Kaminsky* is inapposite.  The court's holding in *Kaminsky* regarding the

---

[20] The Court notes that Plaintiff's argument that a buyer must demonstrate good faith at the time of contracting or at the time of delivery is somewhat in tension with Plaintiff's position that buyer-in-the-ordinary-course status attaches upon transfer of title.  Defendant's approach has the virtue of internal consistency:  A buyer's faith should be measured at the point of identification—the same point at which, assuming the statutory conditions are satisfied, buyer-in-the-ordinary-course status attaches.

buyer's good faith cannot be separated from the court's conclusion that New York's certificate-of-title statute governed the transfers of the vehicle between the owner and the dealership and between the dealership and the buyer.  According to the court, because that statute governed, the buyer could not purchase in good faith without investigating the physical certificate of title to the vehicle he intended to purchase.  *See id.* at 590 ("Had the plaintiff made any investigation to determine the chain of title to the vehicle, the plaintiff would have discovered the existence of the consignment agreement . . . which knowledge would have put the plaintiff on notice that [the dealership] was not the true owner of the vehicle at the time of the transaction and raised doubt concerning [the dealership's] authority to transfer title to the vehicle.").  The Court has already explained that the state certificate-of-title statutes do not govern the transfers of the chassis from Plaintiff to Wolverine and from Wolverine to the Fire Districts.  The Fire Districts therefore had no reason to research title to the chassis:  Had they researched title and discovered Plaintiff's possession of the certificates, such discovery would not have raised any doubt about Wolverine's authority under the UCC to sell the chassis validly.[21]

---

[21] *Kaminsky* also cannot be squared with other doctrines arising out of the UCC. Specifically, under certain circumstances, *merchant* buyers may have a heightened duty to investigate title to goods in order to qualify as buyers in the ordinary course.  *See Joseph P. Carroll, Ltd. v. Baker*, --- F.Supp.2d ----, No. 09-CV-3174, 2012 WL 3731404, at *10 (S.D.N.Y. Aug. 29, 2012) (collecting authority describing that merchant must investigate title to attain buyer-in-the-ordinary-course status in the presence of "warning signs"); *Kozar v. Christie's, Inc.*, 929 N.Y.S.2d 200, 2011 WL 1886585, at *8 (Sup. Ct. May 18, 2011) ("A merchant, therefore, might be required under the UCC to take additional steps to verify the true owner of a piece of artwork." (internal quotation marks omitted)).  Plaintiff has never argued that the Fire Districts qualify as "merchants" under the UCC—persons who "deal[] in goods of the kind or otherwise by . . . occupation hold[] [themselves] out as having knowledge or skill peculiar to the practices or goods involved in the transaction."  Mich. Comp. Laws Ann. § 440.2104(1); N.Y. U.C.C. Law § 2-104(1); Wis. Stat. Ann. § 402.104(3).  Nor has Plaintiff claimed that there were any red flags in the Fire Districts' contracts with Wolverine, such that the Fire Districts were required to

Second, *Kaminsky* aside, there is nothing in the record to suggest anything out of the ordinary about the contracts between Wolverine and the Fire Districts.  Plaintiff has not, for example, alleged that the payment arrangement—each Fire District was required to make an initial down payment to be followed by a balance payment upon delivery—was out of the ordinary.  And third, at the time of contracting, the Fire Districts were unaware that Wolverine might enter into bankruptcy or that Plaintiff might wind up not receiving payment for the chassis it ordered from Kenworth.

For the very same reasons, there is no basis to conclude that the Fire Districts acted in bad faith, measured at the point of identification:  *Kaminsky* is not dispositive, and, therefore, the Fire Districts were not required to investigate the chain of title to the chassis; there is nothing in the record suggesting that Wolverine's method of identifying the chassis to the Fire Districts was abnormal; and the Fire Districts still had no knowledge of Wolverine's impending bankruptcy.

Finally, even if the Fire Districts', or Defendant's, good faith is evaluated at the point of delivery, the Fire Districts, and by extension, Defendant, qualify as buyers in the ordinary course.  To be sure, the method by which the Fire Districts received the chassis was abnormal.  Wolverine had, by then, entered into bankruptcy and Defendant had been forced to purchase the chassis from the bankruptcy estate and to arrange for completion of the trucks by separate corporations.  Furthermore, there can be no doubt that Defendant was aware of Plaintiff's interest in the chassis, as reflected in the Stipulations. (Def.'s 56.1, Ex. C ¶¶ 4–5; *id.*, Ex. D ¶¶ 3–4.)  Defendant may nevertheless assert the Fire Districts' buyer-in-the-ordinary-course

---

investigate the chain of title.  Plaintiff instead urges that same heightened burden should apply to *all vehicle* buyers, based entirely on statutes that are irrelevant to many vehicle purchasers.  That position is untenable.

29

status.  A buyer in the ordinary course takes free of a security interest, "even if the security

interest is perfected and the buyer knows of its existence."  Mich. Comp. Laws Ann.

§ 440.9320(1); N.Y. U.C.C. Law § 9-320(a); Wis. Stat. Ann. § 409.320(1).  Of course, it is also

true that a buyer loses buyer-in-the-ordinary-course status by purchasing a good with knowledge

that "the sale violates the rights of another person in the good."  Mich. Comp. Laws Ann.

§ 440.1201(9); N.Y. U.C.C. Law § 1-201(9); Wis. Stat. Ann. § 401.201(2)(em).  But the official

comments to the UCC reconcile these seemingly inconsistent provisions by instructing that a

buyer takes free of a security interest "if the buyer merely knows that a security interest covers

the goods," whereas a buyer takes subject to a security interest "if the buyer knows, in addition,

that the sale violates a term in an agreement with the secured party."  Mich. Comp. Laws Ann.

§ 440.9320 cmt. 3; N.Y. U.C.C. Law § 9-320 cmt. 3; Wis. Stat. Ann. § 409.320 cmt. 3.  Here,

there is no evidence of a specific agreement to which either Plaintiff or Wolverine was a party

that prohibited the sale or delivery of the fire trucks to the Fire Districts.[22]

There is also no indication that Defendant or the Fire Districts otherwise knew that

Defendant's purchase and delivery of the fire trucks violated Plaintiff's superior rights to the

chassis.  Indeed, it is unclear how Defendant or the Fire Districts could have known that

Defendant's conduct violated Plaintiff's rights, given that, at that moment when Defendant

acquired the chassis, the Parties' respective rights had yet to be determined.  As noted,

Defendant purchased the chassis from the bankruptcy estate pursuant to the Stipulations.  And

the Stipulations charged Defendant with instituting an adversarial action against Plaintiff to

determine the Parties' respective interests in the chassis.  (Def.'s 56.1, Ex. C ¶ 4; *id.*, Ex. D ¶ 3.)

---

[22] It bears emphasis that, after oral argument, the Court allowed Plaintiff, at its counsel's
request, to submit further briefing on the application of the UCC to this case.

To suggest that Defendant knew that its acquisition violated Plaintiff's rights, when Plaintiff's rights were contested and yet to be resolved in an adversarial proceeding, is without foundation.

Because the Fire Districts qualify as buyers in the ordinary course, they took the chassis free of Plaintiff's security interest, and Defendant is subrogated to assert that right following Defendant's performance under its surety bonds. Defendant is therefore entitled to summary judgment on Plaintiff's claims.

The Court is aware that this holding may seem inequitable with respect to Plaintiff, which has never been paid for the chassis that it purchased for Wolverine. But "[t]he difficulty inherent in resolving the competing claims . . . is that the 'villain' of this piece has left the stage—permanently. An insolvent [debtor] is in no position to make [the parties] whole, and it is up to the court to determine between two innocent parties who should bear the risk of loss." *In re Doughty's Appliance, Inc.*, 236 B.R. at 411. The Court agrees with the majority view in the caselaw that the better default rule is that Plaintiff bears that risk. *See, e.g.*, *Daniel*, 425 N.W.2d at 422 ("[T]he inventory financer is better able to guard against the risks inherent in this type of financing than the average retail buyer because the financer is more knowledgeable and has the resources to guard against the risks."). Plaintiff's recourse following Wolverine's bankruptcy was to seek recovery from the estate. Neither the Fire Districts nor Defendant should suffer by virtue of Plaintiff's failure to do so.[23]

---

[23] Defendant separately argues that it possesses a superior interest to Plaintiff's, because Wolverine's bankruptcy estate possessed a superior interest to Plaintiff's—which interest Defendant acquired pursuant to the Stipulations. Under the Bankruptcy Code, the trustee of Wolverine's bankruptcy estate is deemed to have "hypothetically extend[ed] credit to [Wolverine] at the time of [Wolverine's bankruptcy] filing and, at that moment, obtain[ed] a judicial lien on all property in which [Wolverine] ha[d] any interest that could be reached by a creditor." *In re Salander-O'Reilly Galleries*, 475 B.R. at 23 (internal quotation marks omitted). Defendant asserts that right with respect to the chassis.

31

III. Conclusion

For the reasons stated herein, Defendant's motion for summary judgment is hereby

GRANTED, and Plaintiff's request for summary judgment as a nonmoving party is hereby

DENIED.  Per the Parties' stipulation, Plaintiff is hereby ORDERED to transfer the certificate of

title to the chassis bearing VIN 2NKHHN8X89M243581 to Beaverkill and to transfer the

certificate of title to the chassis bearing VIN 2NKHHN8X09M242957 to Waverly.

---

The problem with Defendant's position, however, is that it is not at all clear that the bankruptcy estate's interest is superior to Plaintiff's perfected purchase-money security interest. Section 317 of the UCC provides that a "security interest . . . is subordinate to the rights of . . . a person that becomes a lien creditor before . . . the security interest . . . is perfected."  Mich. Comp. Laws Ann. § 440.9317(1)(b)(I); N.Y. U.C.C. Law § 9-317(a)(2)(A); Wis. Stat. Ann. § 409.317(1)(b)(1).  As noted, Plaintiff perfected its purchase-money security interest on June 11, 2009.  (Def.'s 56.1 ¶ 12; *id.*, Ex. F.)  The trustee of Wolverine's bankruptcy estate became a lien creditor at the time of filing, on September 8, 2009.  *See In re Wolverine Fire Apparatus Co. of Sherwood Mich.*, 465 B.R. at 813.  It would appear, therefore, that under the UCC, Plaintiff's security interest is superior to Defendant's acquired lien.

Things are not so simple, however.  Under the bankruptcy code, a "trustee may avoid any transfer of an interest of the debtor in property" that satisfies certain statutory conditions—a so-called "voidable transfer."  11 U.S.C. § 547(b)–(c); *see also Fidelity Fin. Servs. v. Fink*, 522 U.S. 211 (1998).  Late perfection of a security interest can qualify as a voidable preference if it satisfies those statutory requirements.  *See, e.g., Lange v. Inova Capital Funding, LLC* (*In re Qualia Clinical Serv., Inc.*), 652 F.3d 933, 938 (8th Cir. 2011) (noting that "[t]he creation of a perfected security interest is itself a preference when the creation or perfection takes place during the preference period" (alteration in original) (internal quotation marks omitted)); *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns. Corp.*), 365 B.R. 24, 79 (Bankr. S.D.N.Y. 2007) (denying motion to dismiss creditors' committee's claim that "the perfection of . . . security interests was a voidable preference").  But neither Party has addressed whether Plaintiff's filing here qualifies as a voidable preference.  Nor has either Party addressed whether Defendant may assert that Plaintiff's filing was a voidable preference before this Court, in a nonbankruptcy proceeding.

While these are undoubtedly deeply interesting questions, their resolution here is unnecessary.  Because Defendant acquired the chassis as a buyer-in-the-ordinary course, Defendant took the chassis free of Plaintiff's perfected security interest, regardless of the relative priority of Defendant's interest as a lien holder and Plaintiff's purchase-money security interest.

32

The Clerk of Court is respectfully directed to terminate the pending motion, (Dkt. No. 28), and to close this case.


SO ORDERED.

Dated:        December 19, 2012
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

33

Service List:

Gerald Orseck, Esq.
Orseck Law Offices
1924 State Route 52, P.O. Box 469
Liberty, NY 12754
845-292-5800
orsecklaw@yahoo.com
*Counsel for Plaintiff*

Gary D. Silver, Esq.
Stoloff & Silver, LLP
26 Hamilton Avenue - P.O. Box 1129
Monticello, NY 12701
(845)-794-4300
garyd.silver@verizon.net
*Counsel for Defendant Travelers Casualty and Surety Company of America*